**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| Mustafa Hussein, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   No.   4:14-cv-1410-JAR |
| | ) |
| County of Saint Louis, Missouri, et al, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION**

**I.     INTRODUCTION**

In this case, Plaintiff challenges Defendants' policy or custom of interfering with individuals who are photographing or recording at public places but who are not obstructing or threatening the safety of others or physically interfering with law enforcement. The interference has taken many forms, including threatened arrest for standing in public places and recording, actually arresting journalists, prohibiting media members from standing at public places, ordering them not to record, shoving them, and firing teargas at them. In the United States, such interference is prohibited by the First Amendment, as Defendants acknowledged by entering into an agreement at the beginning of this case. Unfortunately, the policy and custom of interference continues, so Plaintiff must ask this Court for prospective relief.

1

II.     **FACTUAL BACKGROUND**

On August 9, 2014, Michael Brown was shot and killed by a Ferguson, Missouri, police officer. *Abdullah v. Cnty. of St. Louis, Mo.*, No. 4:14CV1436 CDP, 2014 WL 4979314, at *1 (E.D. Mo. Oct. 6, 2014). In the aftermath of Brown's death, people gathered together in locations throughout Ferguson. *Id.* They came for various reasons, including to protest, pray, bear witness, and provide food and water to those who were protesting. *Id.*

The St. Louis County Police Department and the Missouri Highway Patrol are among the police departments that were called upon to assist the Ferguson Police Department with crowd control. *Id.* at *2. The protests, and the response of police to protesters, gained wide attention in the media. As a result, both traditional and non-traditional media outlets arrived, and continue to arrive, in Ferguson to document and report on what is happening there.

Among those reporting on the events in Ferguson is Plaintiff. In order to document what is occurring on the public streets and sidewalks of Ferguson, Plaintiff went to Ferguson beginning on August 13, 2014. Ex. A (Hussein Decl.) at ¶ 4. That evening he witnessed police officers ordering him and others to stop recording. Hussein Decl. at ¶¶ 5-6. Upon hearing the order, Plaintiff was required to choose between surrendering his First Amendment right to record the newsworthy events unfolding on the street before him or risking arrest or serious bodily injury by law enforcement officials if he continued recording and exercising his First Amendment rights. He chose to continue recording, putting his liberty and physical safety at serious risk. Hussein Decl. at ¶ 9. Plaintiff and others continued experiencing interference by law enforcement, including the use of force and threats of arrest if they continued to photograph and record the actions of police officers (Ex. B (Carson Decl.) at ¶ 6, 7; Ex. C (Flores Decl.) at ¶ 10; Ex. D (Campbell Decl.) at ¶ 9; Ex. E (Osterreicher Decl.) at ¶ 22; Hussein Decl. at ¶ 10, 13), denial of entry to the public protest areas (Hussein Decl. at ¶ 13; Flores Decl. at ¶ 8; Campbell

2

Decl. at ¶ 7), and the arbitrary use of force (Carson Decl. at ¶ 7, 10; Flores Decl. at ¶ 10; Ex. F (Loeb Decl.) at ¶ 6; Ex. G (Files Decl.) at ¶ 7). This created a climate of fear amongst reporters in Ferguson. Carson Decl. at ¶ 8; Hussein Decl. at ¶ 16; Campbell Decl. at ¶ 12.

This case was filed on August 15, 2014. (Doc. # 1). Plaintiff withdrew his motion for a temporary restraining order after the parties entered into a written agreement "that the media and members of the public have a right to record public events without abridgement unless it obstructs the activity or threatens the safety of others, or physically interferes with the ability of law enforcement officials to perform their duties." (Doc. # 7, 8).

Despite the written agreement, the policy or custom of interfering with individuals who are photographing or recording at public places but who are not obstructing or threatening the safety of others or physically interfering with law enforcement persists. Media members were ordered to stop recording and leave the West Florissant Avenue area. Ex. H (Yingst Decl.) at ¶ 8. While standing on a curb or in areas understood to be designated for media and recording police officers attempting to disperse protesters on West Florissant Avenue, they were knocked to the ground and had guns pointed at them by SWAT officers. Yingst Decl. at ¶ 11; Files Decl. at ¶ 7. They were forced into a pen located on the parking lot of the Ferguson Market, effectively preventing them from accurately documenting the protest scene. Carson Decl. at ¶ 9; Yingst Decl. at ¶ 9. Some journalists experienced arrest and violence at the hands of law enforcement. Loeb Decl. at ¶ 6; Osterreicher Decl. at ¶¶ 15, 20. Others feared being abused by the police because they saw colleagues and other media members being ordered to stop recording, arrested while recording, and tear-gassed by law enforcement. Carson Decl. at ¶ 10; Yingst Decl. at ¶ 12. The result was the impression on many members of the media that they were being intentionally

targeted by the police with threats of arrest and violence so that they would stop recording and documenting the events as they unfolded.[1] Files Decl. at ¶ 11.

These were not isolated incidents. On October 27, 2014, PEN America released a report, *Press Freedom Under Fire in Ferguson*, which documents fifty-two alleged violations of press freedoms during protests in Ferguson.[2] Ex. I (Bass Decl.) at ¶ 4. The report concludes that the police interfered with the media's ability to do their job in multiple and various ways, making it impossible to dismiss the incidents as isolated. Bass Decl. at ¶ 6.

In light of this unprecedented (at least in America) interference with the recording and photographing of public events, general counsel for the National Press Photographer Association attempted to advocate on behalf of its members with law enforcement officials.[3] Osterreicher Decl. In response to numerous calls from NPPA members who were covering the protests stating that they had been interfered with by authorities and threatened with arrest while lawfully photographing and recording these events, NPPA's general counsel traveled to Ferguson with the goal of attempting to help facilitate press freedoms, as he had in other cities. Osterreicher Decl. at ¶¶ 15, 20, 22-23, 24. Instead, law enforcement officials asked him to convey to the media the importance of obeying orders and to remain in the designated media area. Osterreicher Decl. at ¶

---

[1] A reporter from the National Journal stated, "I had previously never witnessed police treat journalists in the above-described manner. I had worked as a crime reporter in South Florida for four years and my time in Ferguson was the first time I had ever felt afraid of a police officer. I felt far more afraid of the police officers in Ferguson than I did any of the protesters." Campbell Decl. at ¶ 12.

[2] PEN American Center is the U.S. branch of the world's leading international literary and human rights organization. International PEN was founded in 1921 in direct response to the ethnic and national divisions that contributed to the First World War.

[3] The National Press Photographers Association (NPPA) is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing, and distribution. NPPA's approximately 7,000 members include television and still photographers, editors, students, and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted and defended the rights of photographers and journalists, including freedom of the press in all its forms, especially as it relates to visual journalism. Osterreicher Decl. at ¶¶ 2-4.

4

27. Mr. Osterreicher's explanation to law enforcement that the press is allowed to cover matters of public interest from traditionally public fora, such as a sidewalk or a park, and do not have to remain inside of an area specifically designated for them, was met with surprise and disappointment. Osterreicher Decl. at ¶¶ 28-29. It was apparent to Mr. Osterreicher that law enforcement officials lacked any understanding regarding the First Amendment rights of either the press or the public. Osterreicher Decl. at ¶ 30. Mr. Osterreicher wrote letters to each of the Defendant agencies and requested an investigation into abuses of members of the media by law enforcement in the area. Osterreicher Decl. at ¶¶ 15, 18, 35, 40. He also offered to assist with training, as NPPA has elsewhere, so that police officers might understand the First Amendment rights at issue. Osterreicher Decl. at ¶ 48. Defendants failed to provide Mr. Osterreicher with any substantive response. Osterreicher Decl. at ¶ 50, 51.

Under these circumstances, Plaintiff reasonably believes and fears that he will continue to be subjected to Defendants' unlawful policy or custom of interfering with individuals who are photographing or recording at public places but who are not obstructing or threatening the safety of others or physically interfering with law enforcement.

### III.   ARGUMENT

####   A.   Standard for a Preliminary Injunction

In considering a motion for preliminary injunction, this Court must determine whether: (a) Plaintiff is likely to prevail on the merits; (b) there exists a threat of irreparable harm to Plaintiff absent the injunction; (c) the harm to Plaintiff outweighs the injury that granting the injunction would inflict upon Defendants; and (d) the preliminary injunction is in the public interest. *See Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc); *accord Abdullah*, 2014 WL 4979314, at *5. "When a plaintiff has shown a likely violation

of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (en banc) (internal quotation marks and citation omitted).  "In a First Amendment case, ... the likelihood of success on the merits is often the determining factor in whether a preliminary injunction should issue." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds by Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (8th Cir. 2012) (en banc).

      B.      <u>Plaintiff is likely to prevail on the merits</u>

Because Defendants' policy or custom of interfering with individuals who are photographing or recording at public places but who are not obstructing or threatening the safety of others or physically interfering with law enforcement was not enacted pursuant to "reasoned democratic processes," Plaintiff need show only a "fair chance of prevailing" to satisfy *Dataphase*'s first prong.  *See Planned Parenthood v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc). Under this standard, Plaintiff is not required to show "a greater than fifty percent likelihood that he will prevail," *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007) (quoting *Dataphase Sys., Inc.*, 640 F.2d at 113); he only needs to show that his claims provide "fair ground for litigation." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

Plaintiff has a First Amendment right to photograph and record at public places without interference from the police. Defendants' policy or custom of interfering with individuals who are photographing or recording at public places but who are not obstructing or threatening the safety of others or physically interfering with law enforcement violates Plaintiff's First Amendment rights. Moreover, the policy or custom is vague and arbitrarily enforced, violating Plaintiff's due process rights.

6

### 1.   Plaintiff has a clearly established First Amendment right to record public events, and the actions of public officials, on public property.

It is clearly established that "the First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest." *Smith v. Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000); *see, e.g.*, *Glik*, 655 F.3d at 83 (holding that an individual's right to record officers' performance of their duties in public was clearly established); *Fordyce v. City of Seattle*, 55 F.3d 436 (9th Cir. 1995) (holding there is a "First Amendment right to film matters of public interest"); *Robinson v. Fetterman*, 378 F. Supp. 2d 534, 542 (E.D. Pa. 2005) (recognizing that there was "no doubt that the free speech clause of the Constitution protected" individuals who videotaped law enforcement officers because "[v]ideotaping is a legitimate means of gathering information for public dissemination and can often provide cogent evidence"); *Ramos v. Flowers*, 429 N.J. Super. 13, 56 A.3d 869 (App. Div. 2012) (ruling that an independent filmmaker had a right to film police in the course of making a documentary film); *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583 (7th Cir. 2012), *cert. denied*, 133 S. Ct. 651 (2012); *Demarest v. Athol/Orange Cmty. Television, Inc.*, 188 F. Supp. 2d 82, 94-95 (D. Mass. 2002) (finding it "highly probable" that filming of a public official on street outside his home by contributors to public access cable show was protected by the First Amendment, and noting that, "[a]t base, plaintiffs had a constitutionally protected right to record matters of public interest"); *Channel 10, Inc. v. Gunnarson,* 337 F. Supp. 634, 638 (D.Minn.1972) (holding that police interference with television newsman's filming of crime scene and seizure of video camera constituted unlawful prior restraint under First Amendment). Simply put, "a citizen's right to film government officials, including law enforcement officers, in the discharge of their duties in a public space is a basic, vital, and well-established liberty safeguarded by the First Amendment." *Glik*, 655 F.3d at

7

82; *see also Cumming*, 212 F.3d at 1333 (holding that individual citizens have a First Amendment right, subject to reasonable time, manner, and place restrictions, to photograph or videotape police conduct); *Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) (recognizing that audio recording of police activity is entitled to some degree of First Amendment protection and "the act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights").

Plaintiff records public events and the actions of public officials performing their official duties, specifically law enforcement officers, from public places such as streets and sidewalks. He has been engaged in lawful and constitutionally protected activity when confronted by Defendants' policy or custom of interfering with individuals who are photographing or recording at public places but who are not obstructing or threatening the safety of others or physically interfering with law enforcement. Moreover, because Plaintiff is documenting political demonstrations, capturing interactions between police and protesters, and is motivated by a desire to share his recordings with the world in order to achieve changes in police conduct, his activity is also political speech, which is guaranteed the highest level of protection under the First Amendment. *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 186-87 (1999). The Supreme Court has directed courts to "err on the side of protecting political speech rather than suppressing it." *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 457 (2007). Reporters and photographers, including Plaintiff, have a First Amendment right to the speech that Defendants' policy or custom is intended to curtail and, in fact, does curtail.

### 2. The policy or custom of interfering with individuals who are lawfully photographing or recording at public places acts as a prior restraint.

"[A]dministrative ... orders *forbidding* certain communications when issued in advance of the time that such communications are to occur" are a prior restraint on First Amendment

activity. *Alexander v. United States*, 509 U.S. 544, 550 (1993) (quoting M. Nimmer, Nimmer on Freedom of Speech § 4.03, p. 4–14 (1984)). A prior restraint of expression should be weighed by the court "bearing a heavy presumption against its constitutional validity." *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)). In this case, Plaintiff, as well as other journalists and photographers, have been ordered to stop recording. Hussein Decl. at ¶ 6; Carson Decl. at ¶¶ 6, 7; Campbell Decl. at ¶ 9. They have also been ordered to register and stay within a designated area. Carson Decl. at ¶ 9; Osterreicher Decl. at ¶¶ 27, 28; Yingst Decl. at ¶ 9. If they left the designated media area, reporters were threatened with arrest. Carson Decl. at ¶ 9; Yingst Decl. at ¶ 9. At times, law enforcement officials completely prevented reporters from reaching the West Florissant Avenue protest area, attempting to limit the media's exposure to the demonstrations and the police response. Campbell Decl. at ¶¶ 6, 7; Flores Decl. at ¶¶ 7, 8. These actions had the effect of forbidding communication and reporting by Plaintiff and others. Under the present circumstances, orders given by police officers, under color of law, and threat of arrest for non-compliance, are a prior restraint.

> **3.** **Defendants cannot meet their burden to justify their policy or custom of interfering with individuals who are lawfully photographing or recording at public places.**

"When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000); *accord Pursley v. City of Fayetteville, Ark.*, 820 F.2d 951, 956 (8th Cir. 1987) ("[T]he clear rule in this circuit is that in response to a First Amendment challenge, the proponent of the regulation must demonstrate that the government's objectives will not be served sufficiently by means less restrictive of first amendment freedoms." (internal quotation marks and citation omitted)). To meet its burden, the government must show that the regulation is content-neutral,

narrowly tailored, and leaves open ample alternative channels for communication of information. *McCullen v. Coakley*, 134 S. Ct. 2518, 2529 (2014). Defendants cannot meet that burden.

The policy or custom is not content neutral. There is no evidence that it has ever been enforced other than against those photographing and recording at public places in Ferguson in the aftermath of the killing of Michael Brown. Moreover, the interference comes when there is the opportunity to record potential police misconduct; tellingly, there has been no effort to prevent the recording of police officers receiving praise or engaged in mundane tasks. Finally, the custom or policy is enforced against Plaintiff and other members of the media and public only. The police themselves record events while interfering with Plaintiff's ability to record the same events.

There is no legitimate government interest that is advanced by a policy or custom of interfering with individuals who are photographing or recording at public places but who are not obstructing or threatening the safety of others or physically interfering with law enforcement. Indeed, the custom or policy is contrary to our nation's founding principles. Any speech restriction must, at a minimum further a government interest that is legitimate. *See Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989). Government interference with the media at public places is always a suspect tactic, but here it comes when there is no obstruction or threat to the safety of others and in the absence of physical interference with law enforcement. The custom or policy is to interfere with individuals photographing and recording at public places just because the police have decided it is best.[4] That is an insufficient interest as well as an arbitrary practice.

---

[4] Defendants' policy or custom is being enforced against journalists, including Plaintiff, who are not interfering in any way with law enforcement officials. Hussein Decl. at ¶ 7 ("I did not act unlawfully while I was recording the newsworthy events as they unfolded"); Carson Decl. at ¶¶ 6-8 ("I stood approximately 20 yards away from the protesters and 50 yards from the police and took photographs"); Yingst Decl. at ¶ 5-6, 10-11 ("While recording, I was standing on the sidewalk and the officers were standing on the street"); Files Decl. at ¶ 7 ("Despite standing ... in an area I understood to be specifically

"[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*." *United States v. Stevens*, 559 U.S. 460, 480 (2010).

Even assuming, *arguendo*, the policy or custom is content neutral and serves a significant government interest, it nevertheless "is not narrowly tailored" and "burdens substantially more speech than necessary to achieve the state's asserted interests." *McCullen*, 134 S. Ct. at 2537. This case involves police interference with expressive activity at public places.[5] When First Amendment activities occur in traditional public fora like streets and sidewalks, the government has the highest burden to justify limitations on speech, *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983), and "the right of the state to limit the exercise of First Amendment activity is 'sharply circumscribed.'" *Glik*, 655 F.3d at 84 (quoting *Perry Educ. Ass'n*, 460 U.S. at 45). Undoubtedly, many police officers appear not to care for the scrutiny of the camera while in Ferguson. Nevertheless, the custom or policy at issue is not one that restricts only press activity that somehow physically interferes with police activity; it is one that arbitrarily restricts press activity that in public areas that does not interfere with any police activities.

---

designated for media, we were pushed down by State Patrol Officers"). Osterreicher Decl. at ¶ 27 ("Rick Eckert specifically asked me if I would convey to the media the importance of their abiding by orders to remain in the 'media area'"). These journalists have not spoken to law enforcement officials unless they are interviewing them, at a press conference, or are being threatened by the police, in which case they are forced to yell "PRESS" or "MEDIA" in order to halt officers' advances. Carson Decl. at ¶ 7 ("After being told to leave, I again told the officers that I was a photographer from the St. Louis Post-Dispatch and that I was only there to photograph"); Yingst Decl. at ¶ 7 ("I did not speak to officers while I was recording them"); Hussein Decl. at ¶ 7 ("Unless I was interviewing an officer or asking questions during a press conference, I did not speak to officers while I was recording them and my only interactions with officers aws to inform them that I was a member of the press and to inquire as to why I was being ordered not to record their actions".
5   *See* Yingst Decl. at ¶ 11 ("I was positioned on the curb of the street"); Loeb Decl. at 5 ("I spent the evening ... observing both protesters and the police on West Florissant Avenue."); Carson Decl. at ¶ 7 ("I observed and photographed a stand-off ... at the intersection of Lang and West Florissant"); Campbell Decl. at ¶ 6 ("I attempted to walk down the sidewalk"); Flores Decl. at ¶ ("I encountered police officers at the intersection of Canfield and Florrisant").

11

### 4. The policy or custom of interfering with individuals who are lawfully photographing or recording at public places is vague and arbitrarily enforced.

Defendants' policy or custom of interfering with individuals who are photographing or recording at public places but who are not obstructing or threatening the safety of others or physically interfering with law enforcement violates the Due Process Clause.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012). A law is unconstitutionally vague where it "does not provide people with fair notice of when their actions are likely to become unlawful," *Stahl v. City of St. Louis, Mo.*, 687 F.3d 1038, 1041 (8th Cir. 2012), and when it "necessarily entrusts lawmaking to the moment-to-moment judgment of the policeman on his beat." *See Kolender v. Lawson*, 461 U.S. 352, 360 (1983) (brackets and quotation marks omitted).

Because Defendants' policy or custom of interfering with individuals who are photographing or recording at public places but who are not obstructing or threatening the safety of others or physically interfering with law enforcement directly implicates the First Amendment, the custom or policy must have a "greater degree of specificity" than normally required. *Smith v. Goguen*, 415 U.S. 566, 573 (1974) ("Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the [void-for-vagueness] doctrine demands a greater degree of specificity than in other contexts."); *see also Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 872 (1997) (imposing higher standards for vagueness on criminal laws). Here, the policy or custom has *ad hoc*, unascertainable parameters. The public provides insufficient, if any, notice of what is permissible—what is or is not allowed is not based on any written law or policy and is often entirely dependent upon the decisions of each individual officer. Take, for example, the

12

requirement that members of the media remain in designated areas. There is no law that authorizes the police to impose such a restriction, but it is nevertheless imposed and those who disobey such an order and they are then subject to arrest.

In addition to the rules being unclear, they are inconsistently applied. Hussein Decl. at ¶ 18 (noting that the "practice of ordering members of the media and public to stop recording and documenting their actions has been inconsistent"); Carson Decl. at ¶ 7 (noting that one night he was photographing the protests and even exchanging pleasantries with police officers and then, less than an hour later, he was told that he would have to cease photographing and go home or else he would be arrested); Flores Decl. at ¶¶ 6-7 (noting that on her first day in Ferguson she was not "threatened with arrest for attending the rally on West Florissant Avenue, but one day later, she was threatened with arrest for filming). Enforcement is also arbitrary. Flores Decl. at ¶ 10 ("Other photographers were there documenting the scene and I asked the officer 'why they can be here and [I] can't?' The officer responded that I would have to keep moving and ... they would put me under arrest if I didn't leave the area.").

The arbitrary nature of the restrictions is especially problematic where First Amendment freedoms are involved. *See Stahl*, 687 F.3d at 1041-42. As the Supreme Court has observed, "[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963). Thus, "[w]hen speech is involved, rigorous adherence to [due process] requirements is necessary to ensure that ambiguity does not chill protected speech." *F.C.C. v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012). That has been the effect of the challenged custom or policy. Citizens and journalists, including Plaintiff, have been deterred from returning to the protest area, as well as recording and photographing while there, for fear of arbitrary arrest. Files Decl. at ¶ 9

("I left Ferguson the next day because my life had been threatened by police officers and I feared I would be injured, killed, or arrested by police officers if I remained"); Flores Decl. at ¶ 10 ("Since I did not want to be arrested, I left Ferguson and did not return that evening"); Carson Decl. at ¶¶ 7, 8. Loeb Decl. at ¶ 8; Hussein Decl. at ¶ 16. Even if the state were to assert an interest in safety and public order, the state's interest in "curbing criminal activity ... cannot justify legislation that would otherwise fail to meet constitutional standards for definiteness and clarity." *Kolender v. Lawson*, 461 U.S. 352, 361 (1983). Defendants' policy was formulated by the police and allows law enforcement officials to arbitrarily enforce it, thereby "impermissibly delegat[ing] basic policy matters to policemen" in violation of the due process clause. *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972).

C. Remaining *Dataphase* factors weigh in favor of a preliminary injunction.

Although for violations of First Amendment rights a showing that the plaintiff is likely to prevail is sufficient for the issuance of a preliminary injunction, *Swanson*, 692 F.3d at 870, in this case, the other *Dataphase* factors also weigh heavily in favor of a preliminary injunction.

Permitting continued enforcement of the policy or custom will cause irreparable harm to Plaintiff. It is settled law that a "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality).

And, any injury to Defendants from not being able to enforce a likely unconstitutional policy or custom is minimal and cannot outweigh the substantial harm incurred by Plaintiff. "The balance of equities … generally favors the constitutionally-protected freedom of expression." *Nixon*, 545 F.3d at 690.

Finally, "[i]t is always in the public interest to protect constitutional rights." *Id*. at 689; see *Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996,

14

1004 (8th Cir. 2012) (noting that a likely First Amendment violation favors the issuance of an injunction); *Iowa Right to Life Comm., Inc. v. Williams*, 187 F.3d 963, 970 (8th Cir. 1999) (finding that the "public interest favors protecting core First Amendment freedoms"). The public interest is served by allowing access to information about what is occurring on the streets and sidewalks of Ferguson. A policy or custom aimed at limiting photographing and videotaping in public areas limits the public's access to important information about matters of public concern. Video and photographs of spontaneous events have historically provided "uniquely valuable" information. *Whiteland Woods, L.P. v. Twp. of W. Whiteland*, 193 F.3d 177, 183 (3d Cir. 1999). If Defendants' policy or custom had been in place in Selma, Alabama in 1965, for example, the world would never have seen film footage from the Bloody Sunday attack that "touched a nerve deeper than anything that had come before" and the broad dissemination of which was "a turning point in the civil rights movement." *Demarest v. Athol/Orange Cmty. Television, Inc.*, 188 F. Supp. 2d 82, 97-98 (D. Mass. 2002) (*citing* John Lewis & Michael D'Orso, *Walking With the Wind: A Memoir of the Movement,* 344 (1998). This is an important moment for Ferguson— and our Nation—allowing documentation of what occurs is in the public interest.

**IV.     CONCLUSION**

For the forgoing reasons, this Court should enter a preliminary injunction.

Respectfully submitted,

/s/ Anthony E. Rothert
ANTHONY E. ROTHERT, #44827 MO
GRANT R. DOTY, #60788 MO
AMERICAN CIVIL LIBERTIES UNION
         OF MISSOURI FOUNDATION
454 Whittier Street
St. Louis, Missouri 63108
Telephone:     (314) 652-3114
Facsimile:      (314) 652-3112

> GILLIAN R. WILCOX, #61278 MO
> AMERICAN CIVIL LIBERTIES UNION
>       OF MISSOURI FOUNDATION
> 3601 Main Street
> Kansas City, Missouri 64111
> Telephone:   (816) 470-9938
> Facsimile:   (314) 652-3112
>
> *Attorneys for Plaintiff*

CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and a copy was made available electronically to all electronic filing participants.

/s/ Anthony E. Rothert